UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

PASCALE SERVICE CORP.

VS: CA NO 07-247S

INTERNATIONAL TRUCK AND ENGINE CORPORATION and COASTAL INTERNATIONAL TRUCKS, LLC

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF ITS OBJECTION TO DEFENDANT INTERNATIONAL TRUCK AND ENGINE CORP'S MOTION TO DISMISS AND IN SUPPORT OF ITS REQUEST FOR TEMPORARY AND PRELIMINARY INJUNCTIVE RELIEF**

INTRODUCTION

This case involves application of the recently enacted Rhode Island Fair Dealership Act, RIGL §6-50-1 effective June 14, 2007. Claims for tortious interference of contract and estoppel contained in the current Complaint shall be waived, pending consideration of Plaintiff's Amended Complaint filed simultaneously herewith. Plaintiff Pascale Service Corp. (hereinafter Pascale) is a franchised parts supply dealer for Defendant International Truck and Engine Corp. Defendant International Truck and Engine Corp. (hereinafter International) is the owner, manufacturer and franchisor of International Trucks. Coastal is a franchisee in Warwick, RI for the sale of new International trucks, and competes with Plaintiff for the sale of International parts, supplies, and sales. By order of the Court dated October 1, 2007, Coastal International Trucks, LLC (hereinafter Coastal) was dismissed as party defendant. Simultaneous with the filing of this Objection, Plaintiff has filed a motion to amend its complaint to add IC Corporation f/k/a Amtran, Inc. (hereinafter Amtran) as party defendant. Amtran is a wholly owned subsidiary of International's parent; Navistar International, and is its

division engaged in the manufacture and distribution of school bus bodies. Pascale has a separate contract with Amtran that prevents termination without just cause. Performance of the Amtran contract requires that Pascale be given the same access to parts and proprietary information as provided in the International franchise contract. Accordingly, termination of the franchise contract causes a breach of the Amtran contract.

FACTS/ TRAVEL

Pascale has been an authorized dealer for International parts and supplies since 1959 when International was known as International Harvester Corporation. Plaintiff's work included warranty work on International's new and used vehicles, and at times included prep work for new vehicles. On August 21, 1972 Pascale and International executed a "Dealer Sales Agreement" for service parts. **Exh 1: Dealer Sales Agreement.** Plaintiff is informed, and based upon such information and belief, the Agreement was substantively the same as that offered to new vehicle dealers, except its limitation to service parts.

Pascale's warranty work as a dealer continued even after a new vehicle dealer franchise opened in 1978, and continued through the dealer's closure in 1981, and the subsequent re-opening and closure of a new vehicle dealership from 1986 through 1991. In 2005, in reliance on the longstanding relationship existing between Pascale and International, Pascale bid on a contract for the Rhode Island Public Transit Authority agreeing to supply "genuine International parts" for use in the Rhode Island Public

Transit Authority's repair facility. The contract requires Pascale to provide International service parts, and implements penalties if Pascale fails to complete its obligations.

In 1994 International representatives approached Pascale for it to become an Amtran support dealer. At the time, Pascale was continuing to perform warranty work on new International trucks. Amtran, a newly acquired division of Navistar International[1], manufactured and distributed bus bodies. The Amtran buses were being sold in Rhode Island by International's Amtran division to Ryder Transportation and other large bus companies. International supplied the bus chassis, and the bus bodies supplied through its Amtran division. International needed someone to perform warranty work and product support for the owners of the buses.

On September 7, 1994 International and Pascale signed a contract providing that Pascale would perform the warranty work and product support for the buses sold by International through its Amtran division. **Exh 2: Amtran/Pascale Contract**. Bus warranty repairs and parts procurement were performed using the same procedures used to perform warranty repairs and parts procurement on new International Trucks. Parts were purchased from the International parts warehouses and warranty reports were filed in the same manner as an International warranty reports were filed.

[1] Both Amtran and International are wholly owned divisions of Navistar International. Navistar described International as its "operating company," and describes Amtran (now IC Corporation) as an "affiliate."

Pascale continued to perform warranty work and operate as a service parts authorized dealer for both the Amtran buses made subject to the September 7, 1994 contract (**Exh 2)**, and the general International warranty and parts supply work subject to the terms and conditions of the August 21, 1972 Agreement (**Exh 1**). In January 1997 International required that Pascale, and other authorized dealers make an extensive capital purchase for a computer system to maintain inventory control of International service and parts. Pascale's investment was made on promises, expressed and implied that it would continue its ongoing relationship with International. Annual upgrades were required for the operation of the system, as required by International. Notwithstanding the same, International limited Pascale's warranty work. Pascale continued to perform its obligations under the Amtran contract, and continues to do so to this date.

On April 9, 2007 International forwarded a letter to Pascale purporting to terminate the contract effective May 30, 2007. **Exh 5: Termination Letter**. On May 10, 2007, by agreement, the contract was extended through June 30, 2007. **Exh 6: Contract Extension Verification.**

No termination notice was ever sent by International or its Amtran division concerning the September 7, 1994 contract. Regardless of the same, International has effectively breached the Amtran contract through the April 9, 2007 purported termination letter. As per the terms of the September 7 1994 contract, Pascale's access to parts and inventory for the Amtran contract requires International to offer to Pascale the same parts and proprietary information it now seeks to withhold through its purported termination.

See Amtran Contract, paras 3C, and 3F attached as **Exhibit 2**. See also Bulletins attached as **Exhibits 3** and **4** respectively.

As of April 9, 2007 approximately 65% of Pascale income is derived from International service parts work. If the termination is deemed effective, over one half of Pascale's workforce is expected to be laid off. A significant portion of inventory, equipment, building space, and operating systems will be rendered obsolete. Future economic losses would total millions of dollars.

On June 14, 2007, RIGL §6-50-1 *et.seq.* the "Rhode Island Fair Dealership Act" was enacted. The Act provides *inter alia*, that cancellation of dealership contracts shall be controlled by the terms of the Act, and requires prior notice, stated grounds for cancellation, and the right of the dealer to cure the deficiencies noted in the cancellation notice. RIGL §6-50-4. Furthermore, the Act specifically provides that in an action brought by a dealer against the grantor "any violation of this chapter by the grantor is deemed an irreparable injury to the dealer in determining if temporary injunctions should issue." RIGL § 6-50-8.

The Act applies to *any contract or agreement* within the purview of the legislation, and invalidates a wrongful termination to that extent only. RIGL §6-50-3(3). (*emphasis added*). It is to be liberally construed so as promote its underlying remedial purposes and policies, which includes:

(a) To promote the compelling interest of the public in fair business relations between dealers and grantors, and in the continuation of dealerships on a fair basis;

(b) To protect dealers against unfair treatment by grantors, who inherently have superior economic power and superior bargaining power in the negotiation of dealerships;

(c) To provide dealers with rights and remedies in addition to those existing by contract or common law;

(d) To govern dealerships, including any renewals or amendments, to the full extent consistent with the constitutions of this state and the United States…

RIGL §6-50-3.

Pascale is a dealer within the protection of the Rhode Island Fair Dealership Act. On June 19, 2007 Plaintiff notified International and Coastal's legal departments of its intent to file suit to prevent the termination of the contract, and for claims of estoppel, and tortious interference of contract as to both International and Coastal. On June 20, 2007 Plaintiff commenced this action in Providence County, RI Superior Court. A temporary restraining order was granted by the Superior Court on June 21, 2007, and a hearing on preliminary injunction scheduled for hearing on July 2, 2007.

On June 29, 2007, Defendant International filed its Petition to Remove to this Honorable Court, claiming as a basis, a diversity of citizenship with an amount in controversy exceeding $75,000.00. Following removal, the parties agreed to an extension of the status quo; that is that no action would be taken by International to terminate the contract. The inaction to reserve the status quo is without prejudice to the parties; and the parties have agreed that no legal consequences should be inferred by the agreement to extend the contract.[2]

[2] Defendant prefers to refer to the extension as an agreement not to enforce the termination.

On July 13, 2007 Coastal filed a Motion to Dismiss pursuant to Rule 12(b)(6) as to why it should not be included as a party Defendant. In quick succession, on July 16, 2007, International filed the within motion to dismiss. Plaintiff objected to both motions, and requested an extension of time to respond, and to address threshold jurisdictional issues through a motion to remand to state court. The Court granted leave for a brief extension for Plaintiff to file its motion to remand and an objection to Coastal's motion to dismiss, and dependent on the outcome of the same, to respond to International's motion to dismiss within fifteen days of an adverse ruling on Plaintiff's Motion to Remand. On October 1, 2007 the Court denied Plaintiff's Motion to Remand, and dismissed Coastal as a party Defendant.

Contemporaneous with this motion, Plaintiff has filed a motion to amend its complaint to add claims involving the Amtran contract, and, in light of the Court's ruling dismissing the estoppel claim and tortious interference claim against International. Furthermore, Plaintiff respectfully requests that the Court issue a ruling on its Motion to Amend prior to acting on Defendant's Motion to Dismiss, and to then determine the merits of Defendant's Motion to Dismiss in view of the allegations of Plaintiff's amended complaint.

For the reasons stated below, Pascale seeks that International's Motion to Dismiss be denied. Furthermore, Plaintiff requests that a preliminary injunction issue preventing termination of the contracts, until such time as there is a hearing on the merits for

permanent injunctive relief, and at that time to then issue a permanent injunction restraining and enjoining Defendant from terminating its contracts with Pascale without just cause, and in derogation of RIGL §6-50-1 *et. seq*.

STANDARD OF REVIEW

1. <u>On Plaintiff's Motion for a Preliminary Injunctive Relief</u>

In considering a motion for a preliminary injunction, a district court weighs four factors: (1) the plaintiff's likelihood of success on the merits; (2) the potential for irreparable harm in the absence of an injunction; (3) whether issuing an injunction will burden the defendants less than denying an injunction would burden the plaintiffs; and (4) the effect, if any, on the public interest. *Jean v. Massachusetts State Police*--- F.3d ----, 2007 WL 1793126 (1st Cir. 2007); Black *Tea Soc'y v. City of Boston,* 378 F.3d 8, 11 (1st Cir.2004).

2. <u>On Defendant International's Motion To Dismiss</u>

Fed. Rule Civ. P 12 (b)(6) provides:

> Defenses and Objections—When and How Presented—By Pleading or Motion—Motion for Judgment on the Pleadings
>
> …
>
> (b) How Presented. Every defense, in law or fact, to a claim for relief in any pleading, whether a claim, counterclaim, cross-claim, or third-party claim, shall be asserted in the responsive pleading thereto if one is required, except that the following defenses may at the option of the pleader be made by motion:
>
> …
>
> (6) failure to state a claim upon which relief can be granted

When ruling on a motion to dismiss a judge must accept as true all of the factual allegations contained in the complaint. *Erikson v. Pardus,* 127 S.Ct. 2197 (2007). All that is required under the Notice pleading requirements, pursuant to Rule 8(a)(2) is "a short and plain statement of the claim showing that the pleader is entitled to relief." Specific facts are not necessary; the statement need only " 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests. The inquiry under Rule 12(b)(6) is limited, focusing not on "whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974). All facts pled in the complaint are accepted as true and inferences are drawn in the light most favorable to the plaintiff. *TAG/ICIB Servs., Inc. v. Pan Am. Grain Co*., 215 F.3d 172, 175 (1st Cir.2000).

ARGUMENT

1. Dismissal Should be Denied, and a Preliminary Injunction Should Issue in Plaintiff's Favor Preventing the Termination of Plaintiff's Contracts

Should the Court determine that dismissal is denied, a preliminary injunction should issue preventing Defendant International from terminating its contracts with Plaintiff. In considering the motion for a preliminary injunction, a district court weighs four factors: (1) the plaintiff's likelihood of success on the merits; (2) the potential for irreparable harm in the absence of an injunction; (3) whether issuing an injunction will burden the defendants less than denying an injunction would burden the plaintiffs; and (4) the effect, if any, on the public interest. *Jean v. Massachusetts State Police*--- F.3d ----

, 2007 WL 1793126 (1st Cir. 2007); Black *Tea Soc'y v. City of Boston,* 378 F.3d 8, 11 (1st Cir.2004).

Three of the four factors clearly preponderate in favor of the Plaintiff and require no further elucidation. The potential for irreparable harm is set forth in the verified complaint of Plaintiff as to the consequences of termination of its contracts should that occur. Additionally, RIGL § 6-50-7 provides for injunctive relief in the event a grantor violates the provisions of the Act. RIGL § 6-50-8 further states " any violation of this chapter by the grantor is deemed an irreparable injury to the dealer in determining if temporary injunctions should issue."

Where a statute provides for injunctive relief upon the showing of a violation, the party seeking such relief need not make a further showing of irreparable harm. *See* 7 Moore's Federal Practice *1256 s 65.04(1) n. 7b, and cases there cited. The rationale for this type exception is that the party bringing the suit is acting to vindicate the public interest. *See S. E. C. v. Management Dynamics*, 515 F.2d 801, 808 (2d Cir. 1975).

The Court may thus also presume that public interest preponderates in favor of the Plaintiff if an injunction is issued preventing a violation of the RI Fair Dealership Act. Section 3 of the RI Fair Dealership Act states as one of its underlying purposes is " (a) To promote the compelling interest of the public in fair business relations between dealers and grantors, and in the continuation of dealerships on a fair basis…" RIGL 5-50-3 (2).

The Rhode Island legislature has thus set forth a public purpose to enforcement of the statute that should be given effect.

In *Hecht v. Bowles,* 321 U.S. 321, 331, 64 S.Ct. 587, 592, (1944) the Court stated, "standards of the public interest not the requirements of private litigation measure the propriety and need for injunctive relief in these cases [where the statute provides for the injunctive relief]."

Additionally, the Court may consider the 48 year relationship between International and Pascale in weighing the burden on defendant as compared to that of plaintiff. Plaintiff is being asked by International to pack its bags in a relatively short period even after having had a long established relationship. The harm to Pascale's business, its employees, and its future is enormous. International, on the other hand can show no significant losses by maintenance of the *status quo*, and allowing the relationship to continue pending a hearing on the merits. The balance of harm then clearly favors injunctive relief.

The only issue the Court needs to consider then is the likelihood of success on the merits. Like the other factors, this too weighs in favor of Plaintiff. That Plaintiff has a likelihood of success on the merits is set forth in its argument that Defendant's Motion to Dismiss should be denied.

3. Pascale's Verified Amended Complaint Establishes Claims for Breach of the September 7, 1994 Amtran Contract

The Defendant cannot terminate the Amtran contract without just cause. **Exh 2** para 8. Just cause is defined by the contract terms as a breach of the "duties, obligations, or responsibilities imposed upon it by one or more of the operating requirements as outlined in Section 7 of this Agreement…"

Defendant's compliance with the terms of the Amtran contract requires that Pascale be given access to the same proprietary information and parts as that which is provided in the franchise contract (**Exh 1**). By the terms of the Amtran contract, terms and are to be as provided in the Agreement, or "by policy letters or bulletins published by the Company from time to time." (**Exh 2** para 3F). Documents incorporated by reference become part of the contract itself. *U.S. v. ITT Continental Baking Co*., 420 US 223, 238 (1975); *U.S. v. Boston Scientific Corp*., 167 F.Supp.2d 424, 431 (D.Mass. 2001).

By Company Bulletin issued August 13, 1999 and made effective August 2, 1999 "all International service parts policies currently in effect now apply on this product line, and you may place orders in the same way as you do for all International support products." A copy of the Bulletin is attached as **Exhibit 4.**

Service and maintenance parts, and the proprietary information needed to perform service work for the Amtran contract is integrated into the International system. Upon information and belief, it cannot be effectively segregated. Accordingly, by its attempt to terminate the International contract, Defendant has effectively breached its obligations to Plaintiff under the Amtran contract.

3. Pascale's Verified Amended Complaint Establishes Claims for Violation of RIGL §6-50-1

Plaintiff further bases its claim for injunctive relief, and against dismissal on the basis of The Rhode Island Fair Dealership Act. RIGL § 6-50-1 *et. seq.* The RI Fair Dealership Act took effect on June 14, 2007. At the time of its enactment, Pascale and International still had a contract that was made effective through June 30, 2007.

Section 3 of the Act provides that the provisions regarding termination shall be effective as to all contracts. It states in pertinent part " (3) The effect of this chapter may not be varied by contract or agreement. *Any contract or agreement* purporting to do so is void and unenforceable to that extent only." RIGL 6-50-3 (*emphasis added*).

Defendant argues that the Act can only be applied prospectively. Generally, it is presumed that statutes and their amendments are "to operate prospectively unless it appears by clear, strong language or by necessary implication that the legislature intended to give the statute retroactive effect". *Van Marter v. Royal Indemnity Co.*, 556 A.2d 41, 44 (R.I., 1989). There are exceptions that will allow a statute to be applied retroactively. Remedial and procedural statutes may be applied retroactively. *See Pion v. Bess Eaton Donuts Flour Co., Inc.*, 637 A.2d 367, 371 (R.I., 1994); *Fox v. Fox*, 350 A.2d 602, 604 (R.I., 1976).

The remedial exception to the prospective rule is stated in *Grinnell v. Marine Guano & Oil Co.,* 13 R.I. 135, 136 (1880), as follows: "It is not an insuperable objection

to a remedial statute that it affects pending suits, if it affects them remedially, and neither violates vested rights nor impairs the obligation of contracts."

Even if there is a contract impairment by retroactive legislation, it will not be invalidated unless the impairment is substantial. *General Motors Corp. v. Romein,* 503 US 181, 186 (1992); *Energy Reserves Group v. Kansas Power & Light Co.*, 459 US 400, 411 (1983*); McGrath v. Rhode Island Retirement Board* 906 F.Supp. 749, 759 (D.RI 1995). If the impairment is minimal, the inquiry may be ended at the first stage. *Id*.

In the instant matter any vested rights of contract between the parties is not impaired, and if so only minimally. The legislation operates to affect termination provisions only, and then only to the extent that a termination is for an improper purpose, or without cause. All other aspects of the contract remain intact, and the legislation does not impose any restrictions on the relations of the parties during the pendency of the contract.

The RI Fair Dealership Act is remedial legislation. RIGL § 6-50-3 provides in part: "this chapter shall be liberally construed and applied to promote *its underlying remedial purposes and policies" (emphasis added).* It is presumed that the General Assembly intended to attach significance to every word, sentence and provision of a statute. *See Retirement Board of the Employees' Retirement System of the State of RI v. DiPrete*, 845 A.2d 270, 279 (RI 2004); *citing* Champlin's *Realty Associates, L.P. v. Tillson*, 823 A.2d 1162, 1165 (RI 2003). The Act should be read to fulfill the purpose

declared by the Legislature; that is as remedial legislation. As such, it can be given retroactive application.

In dealing with a similar situation, the First Circuit considered whether retroactive application to the New Hampshire Motor Vehicle Franchise Act to a pre-existing manufacturer-dealer agreement should be given. The pertinent language of the Act in NH Gen. Laws 357-C, section 6, stated "all written or oral agreements of any type between a manufacturer or distributor and a motor vehicle dealer shall be subject to the provision of this chapter..."

In *Ford Motor Co. v. Meredith Motor Co., Inc.*, 257 F.3d 67 (1st Cir., 2001) the District Court, D. N.H. declared the provision to be retroactive. The First Circuit, however declined to address the issue on the doctrine of abstention. The First Circuit ruled that since the New Hampshire Supreme Court had not yet made a determination as to whether the statute was to be deemed retroactive, and the claims would be determined on the basis of state law, abstention was warranted[3].

Likewise, provisions of the Rhode Island Motor Vehicle Dealers Act have been given retroactive application. In *Scuncio Motors, Inc. v. Subaru of New England, Inc.*, 715 F.2d 10 (1st Cir. 1983) the Court determined that an amendment to the statute was not retroactive. The amendment stated:

---

[3] It appears that the New Hampshire Supreme Court has not yet addressed the issue.

"It shall be deemed a violation of this chapter for a manufacturer, or officer, agent or other representative thereof: (19) To require that a dealer expand facilities without a guarantee of sufficient supply of new motor vehicles to justify such an expansion or to require that a dealer expand facilities to a greater degree than is necessary to sell and service the number of vehicles that said dealer sold and serviced in the most recent calendar year. RIGL §31-5.1-4(c).

The Plaintiff argued retroactive application of the amendment based upon language that it was to be effective upon passage. The Court determined this was insufficient in and of itself to allow for retroactive application. Rather, the Court contrasted the language with that of a Michigan statute that purported to regulate terminations notwithstanding the terms of a dealer's contract. That provision contained some suggestion of an intention that the statute be given a retroactive application to preexisting contracts. The Michigan statute, M.C.L. 445.522 provided in pertinent part:

> Sec. 2. (1) Notwithstanding the terms, provisions, or conditions of a dealer agreement, the parties to the agreement, in performing, dealing, or complying with the terms, provisions, or conditions of a dealer agreement or in terminating, canceling, or failing to renew a dealer agreement, shall act with good cause and in accordance with reasonable standards of fair dealing.
>
> …
>
> (3) Notwithstanding the terms, provisions, or conditions of a dealer agreement, a manufacturer or distributor shall not terminate, cancel or fail to renew a dealership agreement without giving at least 60 days' written notice of the termination for good cause shown. In a case where there is fraud, insolvency, closed doors, or failure to function in the ordinary course of business, a manufacturer shall give at least 15 days' written notice. Upon a manufacturer's or distributor's termination, cancellation, or failure to renew a dealership agreement, the burden of proof to show the

> manufacturer's or distributor's acting with good cause shall be on the manufacturer or distributor."

In the Michigan case, the legislation was made effective July 11, 1978. The termination was to be effective August 5, 1978. The Michigan Appeals Court deemed the statute to have retroactive effect to prevent the contemplated termination. *Anderson's Vehicle Sales, Inc. v. OMC-Lincoln,* 93 Mich.App. 404,408, 287 N.W.2d 247, 248-249 (1979). The Michigan Court deemed it significant that the legislation addressed terminations that occurred after enactment of the legislation, rather than simply notice of termination. Accordingly, all contracts in existence at the time of the enactment of the legislation were deemed to fall within its proscription.

The *Scuncio* Court contrasted the Rhode Island amendment that it found was not retroactive. It compared the amendment to the pre-existing section of the Statute in RIGL § 35-5.1-4 that provides "Contracts Void: It shall be a violation of this chapter for a manufacturer to terminate, cancel, or fail to renew the franchise of a new motor vehicle dealer except as provided in this subsection…" The *Scuncio* Court stated that this provision did not save the Dealer since it was not applicable to the amended language.

The "Contracts Void" language of the RI Motor Vehicle Dealers Act is similar to the proscriptions provided in the RI Fair Dealership Act that refers to termination in similar terms pursuant to RIGL §6-50-4.

Accordingly, the Court should deny Defendant's Motion to Dismiss as applied to the Amended Complaint. Furthermore, the Court should, respectfully, grant Plaintiff's

request for injunctive relief. All factors warranting such relief preponderate in favor of the Plaintiff. Significantly, the balance of equities strongly favors the Plaintiff in determining whether equitable relief should be granted.

CONCLUSION

Plaintiff should be permitted to amend its complaint adding IC Corporation, an affiliate and including a count for breach of contract as pertains to the Amtran contract (**Exh 2**). Conditioned on the same, Defendant's Motion to Dismiss should be denied, as the Complaint sets forth actionable claims for violation of The Rhode Island Fair Dealership Act, RIGL § 6-50-1 et. seq., and an actionable claim for breach of contract as to the Amtran contract. Plaintiff's request for injunctive relief should be granted per the terms of RIGL §6-50-8, and due to the irreparable harm that would accrue should the contracts be terminated.

PLAINTIFF
By its Attorneys
Law Office of Mark B. Morse

/s/ Mark B. Morse

Mark B. Morse
RI Bar Reg No 3003
111 Wayland Avenue
Providence, RI 02906
(401) 831-0555
fax (401) 273-0937
email: mark@morselawoffice.com

October 14, 2007

10/14/07 2:53 PM

**CERTIFICATION**

I certify that a true copy of the same was transmitted through the ECF filing system and that notice of the same is provided through ECF to the attorneys of record as follows:

Stephen T. Amato, Esq.
Cetrullo & Capone LLP
321 South Main Street
Providence, RI 02903

Richard Peirce, Esq.
Roberts Carroll Feldstein & Peirce, Inc.
10 Weybosset Street, 8th floor
Providence, RI 02903

Barry Pollack, Esq.
Joshua L. Solomon, Esq.
Sullivan & Worcester
1 Post Office Square
Boston, MA 02109

October 14, 2007 /s/ Mark B. Morse